# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 04-0203-TUC-DCB (JM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Jose Luis Espinoza, | |
| Defendant. | |

Pursuant to the February 4, 2004 Order issued by District Judge David C. Bury, this matter was referred to Magistrate Judge Jacqueline Marshall for all pretrial matters.  On August 18, 2005, Defendant Jose Luis Espinoza ("Espinoza") filed a Motion to Suppress Statements (Docket No. 191).[1]  Espinoza's motion was heard by Magistrate Judge Marshall on October 19, 2005.  Espinoza was present and represented by counsel and testified on his own behalf.  Three witnesses were presented by the Government: Border Patrol Agents Kevin Hecht, Louis P. Valentino, Jr., and Tim D. Kouris.  The witnesses were examined and cross-examined.  Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law.  The Magistrate Judge recommends that Espinoza's Motion to Suppress Statements be denied.

. . . .

. . . .

---

[1]The complete title of the pending motion is "Supplemental Memorandum to Defendant Espinoza's Motion to Suppress Statements."  As counsel explained at the hearing, the memorandum supplemented the previously filed list of motions and is the only substantive pleading filed in support of the motion. Tr. 86.

# I.  **FINDINGS OF FACT**

On April 23, 2003, Espinoza was arrested for alien smuggling. (Tr. 45).[2]  That same day, he was taken to the Santa Cruz County Jail on an outstanding warrant. (Tr. 57). The next day, Espinoza was returned to Border Patrol custody and Senior Patrol Agent Louis P. Valentino, Jr., along with his partner, Jason May, interviewed Espinoza because, the agents contend, Espinoza had told the processing agent that he had information regarding alien smuggling in Nogales. (Tr. 14; 45; 57).[3]  In the interview, Espinoza provided general information related to the locations and transportation methods related to alien smuggling, but the information was deemed to general to act upon. (Tr. 16).  At that point, Agent Valentino and his partner gave Espinoza their cell phone numbers and told Espinoza to call them with any information he gathered related to alien smuggling. (Tr. 17).  Espinoza contends that he was told that due to his cooperation he was not going to be charged and that he would be released. (Tr. 58).

In contrast, the agents contend that Espinoza was explicitly informed that he was giving the information on his free will and that he was not working for the Border Patrol. (Tr. 18).  Agent Valentino testified that Espinoza was also told that if he was to get in trouble with the law, the agents would be unable to help him out. (Tr. 18).  Additionally, although Agent Valentino stated that no deal was made with Espinoza in relation to whether he would be prosecuted, he was told that if the information he provided proved reliable and led to successful prosecutions, there was a possibility that he would be paid. (*Id.*).  In any event, Espinoza was not prosecuted at that time. (Tr. 20).

Subsequent to his release, Agent Valentino recalls that Espinoza called him and left messages "a couple times," and Valentino also tried to contact Espinoza "a couple of times,"

---

[2] The transcript of the October 19, 2005, proceedings is designated "Tr." followed by the page number where the cited testimony appears.

[3] Espinoza testified that he had not told anyone that he wanted to talk to agents about providing information related to alien smuggling in Nogales. (Tr. 58).

but to no avail.  (Tr. 22).  Espinoza's recollection of events is that Agent Valentino went to his house or met him at the Food City market on four or five occasions.  (Tr. 58-59). Espinoza contends that he was told that the information he provided "was turning out real good," and that he would receive $50.00 per person apprehended after he had identified a "certain amount of people . . . ."  (Tr. 59-60).  Agent Valentino testified that Espinoza did provide the agents with some information, but it proved to be too general and the agents did not act on it.  (Tr. 22).

On January 28, 2004, Espinoza was again arrested for transporting illegal aliens.  (Tr. 20; 47-48).  Senior Border Patrol Agent Tim Kouris placed Espinoza under arrest after conducting surveillance of two vehicles, a green Ford Explorer and a maroon Lincoln Continental.  (Tr. 48).[4]  At the time of his arrest, Espinoza, along with his wife and two children, was in the Lincoln Continental at the McDonald's parking lot on Crawford Street and Terrace Avenue in Nogales, Arizona.  (Tr. 21; 48).  Agent Valentino was on scene and he recognized Espinoza.  (Tr. 21; 49).  Valentino, along with Agent Kouris, pulled Espinoza aside and Valentino read him his rights.  (Tr. 21; 55).  Valentino does not recall if Espinoza said anything at that time.  (Tr. 21).

Later, along with Senior Patrol Agent Esmeralda Marroquin, Valentino interviewed Espinoza at the Nogales Border Patrol station.  (Tr. 20; 65).  Valentino again read to Espinoza his rights and requested that he sign a Form I-214 rights sheet, which he was willing to do.  (Tr. 22-23, 25; 66; Exhibit 1).  The rights sheet is also signed by Agent Valentino, as the agent who read the rights, and Agent Marroquin, as a witness.  (Tr. 24). Valentino then conducted an audiotaped interview of Espinoza, which was later transcribed. (Tr. 25-26; Exhibit 2 (transcript)).

The transcript of the interview reflects that, after his rights were administered, Espinoza told the agents that he had received a call requesting that he pick-up two men near

---

[4]Espinoza testified that he had never seen Agent Kouris at any time before the hearing.  (Tr. 62).

3

the K-Mart in Nogales and drive them back to the border.  (Exhibit 2, pp. 3-6).  He then claimed that he and his brother went to K-Mart in separate vehicles and that the men got in his brother's vehicle, the green Explorer.  (*Id.*, pp. 7-8).  Espinoza then stated that his brother, with Espinoza following, then proceeded to the McDonald's, where they were apprehended.  (*Id.*, p. 8).  After listening to this story, Valentino confronted Espinoza with information obtained during the agent's surveillance of Espinoza's activity that day.  (*Id.*, pp. 8-10).  Espinoza then admitted that he had twice accompanied his brother when illegal aliens were loaded into his brother's vehicle.  (*Id.*, p. 12).

## II.   CONCLUSIONS OF LAW

### A.   Miranda

"A person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

Here, it is undisputed that Espinoza was in custody and was informed of his *Miranda* rights.  The agents uniformly testified that the rights were provided and also had Espinoza sign a waiver.  While, Espinoza testified that he did not remember if his rights were read to him, he does believe that his rights were read to him.  (Tr. 78).  As such, the issue is not whether he was informed of his rights, but whether he waived them voluntarily and otherwise provided his statement voluntarily.

### B.   Voluntariness

The inquiry into the voluntariness of a confession is the same as the inquiry into the voluntariness of a waiver of *Miranda* rights.  *See Derrick v. Peterson,* 924 F.2d 813, 820 (9th Cir.1990).  Only voluntary confessions are admissible.  *Malloy v. Hogan*, 378 U.S. 1, 7 (1964).  *See also* 18 U.S.C. § 3501(a) (West 2000) ("[A] confession . . . shall be admissible

in evidence if it is voluntarily given."). The government must prove voluntariness of a confession by a preponderance of the evidence. *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994). The voluntariness of a post-*Miranda* statement is analyzed in light of its independent surrounding circumstances. *See Oregon v. Elstad,* 470 U.S. 298, 318 (1985); *see also United States v. Orso,* 266 F.3d 1030, 1036 (9th Cir.2001) (en banc) (discussing *Elstad*'s holding), *cert. denied*, 537 U.S. 828 (2002). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir.2002) (citation and internal quotation marks omitted); *see also Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.2003).

Espinoza asserts that, after he was detained on April 23, 2003, he entered into an agreement with Border Patrol agents to cooperate with them in apprehending illegal aliens. Pursuant to this agreement, he contends, Espinoza was told after his detention on January 28, 2004, that if he cooperated no charges would be filed and he, his wife and his brother would be released. A promise such as this vitiates consent if it is "sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988). The Supreme Court has held that a confession is not free and voluntary if "obtained by any direct or implied promises, however slight. Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 347-48 (1963). The promise alleged to have been made by Agent Valentino is the sort that would elicit a confession from most suspects. It was direct and substantial: Espinoza claims that he was told that he and his family members would be released after giving his statement. Because the Supreme Court has determined that promises of the nature involved here render a statement involuntary,

Espinoza's statement is subject to suppression if the Government cannot sustain its burden of proving voluntariness.

Other than Espinoza's testimony to the contrary, all of the evidence on the issue supports a finding that his statement was voluntarily made. As discussed above, Espinoza admits that his rights were read to him and he signed a form recognizing as much. (Exhibit 1). The form also contains a waiver provision which expressly provides that "[n]o promises or threats have been made . . . and no pressure or coercion of any kind has been used . . . ." (*Id.*). It is not disputed that Espinoza signed the waiver. (Tr. 79).

During the interview, Agent Valentino expressly stated to Espinoza that he was not working for the Border Patrol and that he never had, and Espinoza agreed. (Tr. 27; Exhibit 2, p. 9). Espinoza was also informed that any information he offered would be voluntarily provided. (Tr. 27; Exhibit 2, p. 10). At the hearing, Agent Valentino described the process of becoming an informant and entering into a cooperation agreement with the Government. (Tr. 29). He explained that a cooperation agreement is considered only after an individual has expressed a willingness to cooperate and subsequently provides information that proves reliable and results in prosecutions. (*Id.*). Agents will write memoranda reflecting the information and the results obtained which will then be forwarded to the sector intelligence office and a suitability interview will be conducted with the potential informant. (Tr. 30). Then, if the individual is deemed suitable, the sector intelligence officer will enter into a written agreement with the informant. (*Id.*). The agreement provides several rules. Among them is that the individual cannot involve himself with any illegal activity. (Tr. 31). Finally, Agent Valentino stated that he had never entered into any agreement of this sort with Espinoza. (Tr. 32). Other than Espinoza's claim, there is no evidence that contradicts the agent's testimony.

Espinoza nevertheless contends that portions of the interview are not reflected in the transcript. He testified that during the taping of the interview, the tape ran out and, while the interview was not being taped and while no other agents were in the room, Agent Valentino

told him that if he complied, he was going to release Espinoza, his wife, and their children. (Tr. 66-67). Espinoza does not, however, recall when it was that the tape allegedly ran out. Moreover, upon review of the transcript, there is no evidence that the tape was interrupted at any time. Without any corroborating evidence to support Espinoza's contradictory account of events, the Court cannot find him credible. Under the circumstances presented by this case, the Government has fulfilled its burden to prove Espinoza's statement was voluntary by a preponderance of the evidence under the totality of the circumstances.

## III.    RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule Civil 72.2, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Defendant Jose Luis Espinoza's Motion to Suppress Statements (Docket No. 191).

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within 10 days after being served with a copy of this Report and Recommendation. If objections are not timely filed they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR 04-0203-TUC-DCB**.

DATED this 8th day of November, 2005.

Jacqueline Marshall
United States Magistrate Judge

7